**IN THE UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| THINGS REMEMBERED, INC., *et al.*,[1] | ) Case No. 19-10234 (__) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |

**DECLARATION OF ROBERT J. DUFFY,**
**CHIEF RESTRUCTURING OFFICER OF THE DEBTORS, IN**
**SUPPORT OF DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, Robert J. Duffy, hereby declare under penalty of perjury:

1.    I am the Chief Restructuring Officer of the above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Company"), all of which are organized under the laws of Delaware.  I submit this declaration to assist the United States Bankruptcy Court for the District of Delaware (the "Court") and parties in interest in understanding the circumstances compelling the commencement of these chapter 11 cases and in support of the Debtors' chapter 11 petitions and certain motions and applications filed today (the "First Day Motions").

2.    Except as otherwise indicated, all statements in this declaration are based upon my personal knowledge, my review of the Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, my conversations with the Debtors' counsel or other advisors, or my opinion based on my experience with the Debtors' operations and financial condition.  In making my statements based on my review of the

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include:  Things Remembered, Inc. (2696); TRM Holdco Corp. (5858); and TRM Holdings Corporation (2354).  The location of the Debtors' service address is: 5500 Avion Park Drive, Highland Heights, Ohio 44143.

Debtors' books and records, relevant documents and other information prepared or collected by the Debtors' employees, or my conversations with the Debtors' counsel or other advisors, I have relied upon these employees or advisors accurately recording, preparing or collecting such documentation and other information.

3.      I am and have been a Managing Director with Berkeley Research Group, LLC ("BRG"), effective as of May 24, 2016.  BRG is a professional services firm with an office located at 2200 Powell Street, Suite 1200, Emeryville, California 94608.

4.      BRG's Corporate Finance practice consists of senior financial, management consulting, accounting, and other professionals who specialize in providing financial, business, and strategic assistance frequently in situations involving underperforming and distressed businesses.  BRG serves troubled companies, debtors, and secured and unsecured creditors, equity holders, and other parties in both in-court and out-of-court engagements similar to the Debtors' in the State of Delaware and elsewhere.  BRG's professionals have experience working on cases with similar fact scenarios in which they were presented with issues and performed analyses similar to the work at hand in this case.

5.      Before joining BRG in 2016, I spent 14 years at FTI Consulting, Inc. and 14 years at PricewaterhouseCoopers.  Most recently before joining BRG, I was the Global Practice Leader of the FTI Consulting Corporate Finance/Restructuring practice having joined FTI Consulting, Inc. following its 2002 acquisition of the restructuring practice at PricewaterhouseCoopers.  Between 1988 and 2002, I worked in restructuring at PricewaterhouseCoopers and was as a Partner at the time of the sale of its restructuring practice to FTI Consulting, Inc. in 2002.  I have over thirty years of experience in the restructuring industry serving as an advisor to private equity firms, corporations, lenders and boards of directors of underperforming businesses and

companies in transition.  I have an undergraduate degree from Babson College and a MBA degree from the Kellogg Graduate School of Management at Northwestern University.  Among other organizations, I have been active in American Bankruptcy Institute, Turnaround Management Association and Association of Insolvency Accountants.  I am a Fellow of the American College of Bankruptcy.

6.      If I were called to testify as a witness, I could and would competently testify to each of the facts set forth herein based upon my personal knowledge, review of documents, or opinion.  I am authorized to submit this declaration on behalf of the Debtors.

### Preliminary Statement

7.      The Company is a 53-year-old personalized-gift business that, in the weeks and days leading up to the Petition Date, was on the verge of closing all of its stores.  Instead, the Company has filed these chapter 11 cases with an agreement to sell a significant portion of the stores and its direct-sales business as a going-concern.  Although stores not acquired will need to close, the going-concern sale will save hundreds of jobs and potentially many more and provide an improved, and significantly less risky, recovery to stakeholders.  However, there are risks associated with keeping the acquired stores open and buying additional inventory to facilitate the sale.  The Debtors, in consultation with its secured lenders, determined that the benefits outweighed the risks but only if the Debtors could move expeditiously toward closing the going-concern sale on the 30-day timeline reflected in the Debtors' various First Day Motions and described further in this declaration.  After the sale closes, the Debtors intend to confirm a chapter 11 plan that distributes the proceeds of the going-concern sale, the store closing sales, and other asset dispositions to its creditors.  Importantly, the sale has the support of a supermajority of the Debtors' prepetition lenders.

8.     Like many other retailers, the Company has suffered from adverse macro-trends, as well as certain microeconomic operational challenges.  Faced with these challenges, the Company initiated multiple go-forward operational initiatives to increase brick-and-mortar profitability, such as store modernization through elimination of paper forms and the addition of iPads to streamline the personalization and sale process, and by shuttering a number of underperforming locations.  The Company also sought to bolster the Debtors' online-direct sale business, including aggressive marketing to loyal customers to facilitate sales through online channels, attracting new customers via an expanded partnership with Amazon, and increasing service capabilities for the business-to-business customer segment.

9.     Despite these efforts the Company continued to experience negative cash flows and, ultimately, perilously low liquidity.  By late 2018, it became clear that the Company's capital structure was unsustainable and that the Company would likely have insufficient cash to fund operations in January 2019.   The situation was such that, absent a buyer willing to acquire the Company's physical locations, the Company would likely need to shutter all of its stores and terminate the vast majority of its employees.

10.     Against this backdrop, the Company initiated discussions with its lenders and equity owners regarding potential restructuring alternatives to maximize stakeholder value. These restructuring alternatives included a going-concern sale, a multi-year out-of-court store closure process through ordinary course lease expirations, or an orderly chapter 11 liquidation. The Company determined to commence a prepetition marketing process to determine market interest in a going-concern sale of some or all of the Company's assets.

11.     The Company, in consultation with its secured lenders, determined not to repay the revolving credit facility at year-end as required by the Credit Agreement (as defined herein).

The secured lenders effectively agreed to forebear from exercising default remedies between year-end and the Petition Date to allow the Company to market its assets. This arrangement created $11 million in incremental cash-on-hand to fund both the prepetition restructuring efforts and these chapter 11 cases.

12. The Company retained restructuring advisors to aid in these efforts. BRG has been assisting the Debtors with their restructuring efforts since January 2017. In 2017 and early 2018, the Company aggressively sought additional financing to provide the liquidity required to implement operational fixes, but was ultimately unsuccessful in securing financing on acceptable terms. Starting in late 2018, BRG assisted in preparing a detailed cash-flow model for multiple potential restructuring scenarios, conducting extensive first-day diligence and preparation efforts, and providing support for day-to-day liquidity management functions. Members of the BRG team have also supplemented roles of existing employees, due to employee turnover, including the departure of the former Chief Financial Officer, as well as increased workloads as a result of the restructuring preparation process. In addition to my appointment as Chief Restructuring Officer, Brett Witherell from BRG was appointed as Chief Financial Officer following the resignation of the former Chief Financial Officer in January.

13. In addition to BRG, the Debtors have worked with Kirkland & Ellis LLP, as restructuring counsel since February 2016. In December 2018, the Debtors hired Stifel, Nicolaus & Co., Inc. and Miller Buckfire & Co., LLC (collectively, "Stifel/Miller Buckfire"), as investment banker to initiate a comprehensive marketing process for some or all of the Debtors' assets.

14. With the assistance of their advisors, the Debtors marketed a potential going-concern transaction for approximately 50 days before the Petition Date. Beginning in December

2018, the Debtors and Stifel/Miller Buckfire directly reached out to interested parties, including various strategic and financial buyers, and BRG facilitated extensive diligence requests from parties in interest during the marketing process.

15.     By early January 2019, the Debtors had received two written proposals that contemplated the closing of all physical locations as well as an acquisition of the direct-sales business, which consists of the Debtors' e-commerce website, headquarters, fulfillment and distribution center in North Jackson, Ohio (the "<u>Fulfillment and Distribution Center</u>"), and related assets (collectively, the "<u>Direct Business</u>").   In the week before the Petition Date, the Debtors received a written proposal from Enesco LLC ("<u>Enesco</u>"), an international giftware business that is a portfolio company of Balmoral Funds LLC.   Enesco proposed acquiring the Direct Business plus approximately 128 additional stores, subject to a right to add or remove stores with a 50 store minimum (the "<u>Acquired Stores</u>").   The Debtors agreed to extend their anticipated filing deadline in part to facilitate Enesco's bid.

16.     After extensive negotiations and due diligence efforts, the Debtors determined to select Enesco's proposal as the stalking horse bid (such bid, the "<u>Stalking Horse Bid</u>" and, such bidder, the "<u>Stalking Horse Bidder</u>").   The Debtors and the Stalking Horse Bidder entered into the Asset Purchase Agreement (including all exhibits and schedules related thereto, the "<u>Stalking Horse APA</u>").   The Stalking Horse Bid is for $17.5 million in cash, subject to post-closing adjustments, and includes a $3 million earnest money deposit.

17.     The Stalking Horse Bid presents a number of significant advantages, as compared to the Debtors' other available restructuring alternatives.   Unlike other bids, it preserves both the Direct Business and the brick-and-mortar business as a going concern.   In so doing, the Stalking Horse Bid is expected to save hundreds of jobs and potentially many more, all of which would be

lost in a full liquidation. Additionally, because it contemplates acquiring the inventory at the Company's Fulfillment and Distribution Center and the Acquired Stores, it materially reduces the risk associated with the store-closing sales, which, especially given the personalization component of the Company's inventory, could yield less than anticipated recoveries. The Stalking Horse Bid also provides greater projected value than a full liquidation.

18.    Obtaining the benefits of this Stalking Horse Bid (or any other going-concern transaction), however, is not without risk. The stalking horse bid, like the other going-concern proposals the Debtors received, requires the Debtors to continue operating the acquired assets as a going-concern. Although this is well-worth the added benefits of a going-concern sale, it has an opportunity cost for every day that the Debtors do not otherwise dispose of the acquired assets through store-closing sales or otherwise. Moreover, the Debtors simply have rapidly dwindling liquidity and a limited timeframe during which they can remain in a position to consummate a value-maximizing going-concern sale.

19.    The Debtors, the secured lenders, and the Stalking Horse Bidder agreed to two critical constructs to mitigate these risks and facilitate the value-maximizing going-concern transaction embodied in the Stalking Horse Bid. First, the parties agreed to an above-market $3 million deposit that will reimburse the estates in the event that the deal fails to close because of a material breach by the Stalking Horse Bidder. Second, the parties agreed to seek Court approval of the fastest timeline between the Petition Date and closing of the sale that was reasonably achievable and appropriate under the circumstances. This timeline materially reduces the risks associated with pursuing a going-concern sale, allowing the estates to realize its significant benefits and superior value. And, even as the Debtors move forward with the

postpetition sale process, Stifel/Miller Buckfire will continue to market the Debtors' assets and solicit other offers consistent with the bidding procedures discussed further herein.

20.     Concurrently with the sale process, the Debtors will seek to continue the store closing process that began prepetition.  Before the Petition Date, the Debtors commenced "Phase 1" store closing sales at approximately 220 stores and 30 kiosks (the "Phase 1 Store Closings"). To the extent one or more of the Acquired Stores is not purchased by the Stalking Horse Bidder, the Debtors expect to commence "Phase 2" store closing sales (the "Phase 2 Store Closings") for any of the Acquired Stores not ultimately purchased by the Stalking Horse Bidder.   After discussions with several firms that specialize in store closings and inventory dispositions, the Debtors entered into a contractual joint venture (as amended and restated, the "Consultant Agreement") with Hilco Merchant Resources, LLC and Gordon Brothers Retail Partners, LLC ("Consultant") to conduct the store-closing sales.

21.     The Debtors intend to move quickly to confirmation of a chapter 11 plan following the sale closing.  The Debtors expect to file a plan and disclosure statement in the near term that have the support of a supermajority of the lenders.   The plan will distribute the proceeds of the going-concern sale, the store-closing sale, and other asset dispositions to creditors in accordance with the priority of their claims.   To finance the process, the Debtors obtained the consent of their prepetition lenders to use cash collateral during the chapter 11 cases.

22.     To familiarize the Court with the Debtors, their business, the circumstances leading to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions filed contemporaneously herewith, I have organized this declaration as follows:

- **Part I** provides a general overview of the Debtors' corporate history and operations;

- **Part II** provides an overview of the Debtors' prepetition capital structure;

- **Part III** describes the circumstances leading to these chapter 11 cases;

- **Part IV** describes the Debtors' prepetition going-concern sale marketing efforts, the Stalking Horse Bid, and the anticipated chapter 11 plan; and

- **Part V** sets forth the factual basis in support of the First Day Motions.

## I.  Corporate History and Business Operations.

### A.  General Background.

23.     The Company was founded by Cole National in 1966 and began as a small engraving and services shop called "Can Do."  Over the course of the ensuing 53 years, the Company established a respected brand name as it grew into one of the nation's leading multi-channel personalized apparel and accessory retailers.  By 2013, the Company operated 529 stores and 133 kiosks across 43 states and four Canadian provinces.  Today, the Company operates approximately 400 stores and kiosks in the U.S., approximately 19 stores in Canada, and the Fulfillment and Distribution Center, and are in the second year of their revamped website platform.



24.    The Debtors sell personalized gifts such as jewelry, drinkware, kitchen and home accessories, and business recognition gifts through two main channels—stores and direct website sales.  The Debtors developed their store footprint in malls throughout the United States and Canada, which make up approximately 75 percent of all sales.  In 2010, the Debtors launched their original website to conduct direct sales to online customers.  In November 2016, the Debtors migrated their website to respond to the transition of consumer preference from brick-and-mortar stores to online channels.  While the Company faced initial challenges with this migration, from November 2016 to October 2017, the Debtors implemented numerous platform stability and technical improvements to the website, ultimately resulting in a spike in direct sales in the fourth quarter of 2017.  Direct sales increased from 24 percent of all sales in 2017 to 26

percent of all sales in 2018 following an overhaul of the website.  The Debtors believe that direct sales will continue to grow going forward.

**B.      The Debtors' Business Operations.**

**1.      Geographical and Digital Presence.**

25.      The Company has a presence in the U.S. and Canada.  As of January 2019, it operated approximately 400 locations in shopping malls across 43 states nationwide, with 19 locations in Canada.  Currently, California, Florida, and Texas host the most brick-and-mortar locations with approximately 49, 32, and 30 locations, respectively.  The Company closed approximately 280 unprofitable U.S. stores from 2012–2018.  Concurrently with past store closures, the Company shortened lease terms at ongoing stores to an average of 2.1 years with lease renewals generally occurring late January or February following the previous year's fourth quarter results.  This has allowed the Company to remain flexible and control rent costs as needed while also shifting operational focus to profitable stores.



26.      In addition to an extensive geographic footprint, the Company maintains a robust online presence through its thingsremembered.com website.  Customers can seek out numerous

products and complete the personalization process on the Company website.  A user-friendly and well-curated website is crucial to ensuring a seamless customer experience.  To that end, the Company has invested substantial time and resources to establish and refine its website to compete with its online-only competitors.

### 2. Product Mix and Sales Process.

27.    As discussed, the Debtors offer a broad range of personalized gifts and accessories including handbags, apparel, fashion jewelry, and homeware.  The Debtors' inventory consists of 14 general categories of products, with office, men's jewelry and accessories, and women's jewelry ranking highest in overall sales.  The quality and long-lasting nature of products is a critical component of the Company brand and a key driver to maintain a loyal customer base.  After selecting the product, the product customization then occurs in store or through the website.  Customers can expect to receive an engraved product within an hour of visiting the store while online orders are customized at the Debtors' Fulfillment and Distribution Center and shipped to customers or to stores in as little as one to two days.

### C. Critical Components of the Debtors' Cost Structure.

### 1. Supply Chain and Vendor Relationships.

28.    The Debtors' supply chain is one of the most important components of the personalization process.  The Debtors maintain an integrated supply chain aimed at ensuring the uninterrupted flow of fresh merchandise to their brick-and-mortar locations and to the Fulfillment and Distribution Center.  Generally, the Debtors contract with various domestic and foreign vendors to acquire their merchandise, located predominantly in Europe and Asia.  All merchandise flows through the Fulfillment and Distribution Center, where the Debtors utilize over 1,300 pieces of equipment to engrave, embroider, laser, foil stamp, and etch the merchandise pursuant to customer orders from both stores and online.

29.     Personalized products require higher quality and more exacting tolerance to permit engraving, embroidery, and other customization processes.  Accordingly, the Debtors mandate vendors to undergo a rigorous qualification process that generally lasts 9–12 months. This longstanding vetting process has yielded a limited number of highly specialized vendors— some with relationships spanning as many as 20 years—making the time and costs associated with switching from one vendor to another significant.  The Company also sources products from well-known consumer brands such as Fossil, Bulova, and Waterford, that customers may purchase in-store or online.

### 2.     Employee Compensation and Benefits.

30.     The Debtors employ approximately 2,700 non-seasonal employees, including approximately 1,400 full-time employees and approximately 1,300 part-time.  In addition, the Debtors hire seasonal staff to bolster the workforce during the busy seasons.  At this time, the Debtors employee approximately 1,650 seasonal employees.  The Debtors employ approximately 240 employees at the Fulfillment and Distribution Center throughout the year and during times of peak seasonality, up to approximately 750 employees.

### 3.     Leased Real Estate Obligations.

31.     The Debtors lease all of their store locations and estimate that the aggregate occupancy costs for the Debtors' go-forward stores will be approximately $16 million in fiscal year 2019.  The Debtors also own their corporate headquarters in Highland Heights, Ohio, and lease a satellite office in Columbus, Ohio.

## II.     The Debtors' Prepetition Corporate and Capital Structure.

32.     A summary chart depicting the Debtors' corporate structure is attached hereto as **Exhibit A**.  As of the Petition Date, the Debtors' capital structure consists of outstanding funded-debt obligations in the aggregate principal amount of approximately $143.6 million, including

the Revolving Credit Facility and the Term Loan (each as defined herein).  The following table summarizes the Debtors' outstanding funded-debt obligations as of the Petition Date:

| Funded Debt | Maturity | Principal Amount Outstanding |
|---|---|---|
| Revolving Credit Facility | February 28, 2019 | $18.7 million |
| Term Loan | February 29, 2020 | $124.9 million |
| TOTAL | | $143.6 million |

**A.     Credit Agreement.**

33.     On May 24, 2012, in connection with the acquisition of Things Remembered, Inc. by certain prior equity investors, Things Remembered, Inc., as borrower, TRM Holdings Corporation, various lenders party thereto, and Barclays Bank PLC (and Cortland Capital Market Services LLC ("Cortland"), as successor in interest to Barclays Bank PLC) as administrative agent and collateral agent entered into that certain Credit Agreement (as amended, restated, and supplemented from time to time, the "Credit Agreement").  The Credit Agreement made available to Things Remembered, Inc. a revolving credit facility and term loan facility.

34.     On August 30, 2016, the lenders under the Credit Agreement and the prior equity investors of Things Remembered, Inc. consummated an out-of-court exchange transaction, pursuant to which the existing shares of TRM Holdco Corporation issued to such equity investors were cancelled and new shares were issued and distributed to the then-existing lenders. In connection with the transaction, parties to the Credit Agreement also amended and restated the Credit Agreement.  As a result, all drawn revolving loans under the Credit Agreement were converted into term loans and the principal amount of all term loans (including the converted term loans) under the Credit Agreement were reduced to $95 million from $117 million.  The

existing revolving credit facility was cancelled and certain lenders provided a new $20 million revolving credit facility.

35.     The Credit Agreement was further amended and supplemented several times thereafter, including a second amendment and restatement on January 30, 2018, pursuant to which the then-existing revolving credit facility was terminated and a new revolving credit facility was provided by certain lenders.  As of the Petition Date, the revolving credit facility (the "Revolving Credit Facility") has approximately $18.72 million outstanding, with a maturity date of February 28, 2019, and the term loan (the "Term Loan") has an outstanding principal amount of approximately $124.9 million (including fees, costs, and expenses), after giving effect to the increase as a result of payment-in-kind interest ("PIK Interest") payments, with a maturity date of February 29, 2020.

### 1.     Revolving Credit Facility.

36.     The Revolving Credit Facility currently provides for total revolving credit commitments of $17 million.  The Revolving Credit Facility provides for LIBOR loans and Base Rate loans.  The LIBOR loans bear interest (per annum) at LIBOR (with a one percent floor) plus an eight percent margin, payable in cash, and 12 percent deferred interest.  The Base Rate loans bear interest (per annum) at Base Rate (equal to the higher of (a) the applicable prime lending rate, (b) 0.50 percent above the overnight federal funds rate, or (c) one percent above LIBOR, subject to a two percent floor) plus a seven percent margin, payable in cash, and 12 percent deferred interest.  Interest payments are due the last business day of each applicable interest period with respect to LIBOR loans and quarterly with respect to Base Rate loans, except that, in each case, deferred interest is only payable in cash on the earlier of the maturity date or the date the revolving credit commitments are terminated and paid in full.

37.     The Revolving Credit Facility is secured by an all assets lien, including, without limitation, a lien on the Debtors' accounts (including receivables), inventory, deposit accounts, security accounts, cash, and cash equivalents, as well as on certain other property of the Debtors, including, without limitation, the Debtors' intellectual property and 65 percent and 100 percent of the equity in Things Remembered Canada, Inc. and Things Remembered, Inc., respectively.

## 2.     Term Loan.

38.     The Term Loan currently bears interest at an annual rate equal to 12 percent, which consists of one percent of cash interest and 11 percent PIK Interest.  Both cash interest and PIK Interest are payable on the last business day of each calendar month.  Obligations under the Term Loan are secured by the same collateral as the Revolving Credit Facility; however, the Term Loan is subordinated, to the extent set forth in the Credit Agreement, to the payment in full of the obligations in respect of the Revolving Credit Facility.

39.     As of the Petition Date, approximately $110.1 million in aggregate principal amount remained outstanding under the Term Loan Facility, and approximately $14.8 million in fees, costs, expenses, and PIK Interest accrued to balance, for a total outstanding balance of approximately $124.9 million.

## III.    Events Leading to these Chapter 11 Cases.

40.     A confluence of factors contributed to the Debtors' need to commence these chapter 11 cases.  These include macroeconomic factors—most significantly, the general shift away from brick-and-mortar stores to online channels and the accompanying departure of anchor mall tenants—which have led to a decrease in foot traffic and sales.  Microeconomic factors—including delays in the website migration, year-over-year lagging store sales, delayed procurement and non-receipt of inventory due to vendor payment issues, and a disproportionately large physical footprint—compounded the macroeconomic factors and led to

both substantially reduced revenue and spending cuts across key operational areas. Over time, these factors have tightened the Debtors' liquidity, with year-to-date comparable store sales declining 6.2% percent and a negative year-end EBITDA of $4 million, and complicated their relationship with their vendors. These factors culminated in a liquidity crisis by December 2018, when the Debtors faced dwindling cash flows, inaccessible inventory, tightening trade credit, the inability to access incremental liquidity, and winter holiday sales below historical numbers.

### A.    Challenging Operating Environment.

41.    The Debtors, along with many other retail companies, have faced a challenging commercial environment over the past several years brought on by increased online competition and the shift away from shopping at brick-and-mortar stores. Given the Debtors' substantial brick-and-mortar presence in shopping malls, and the expenses associated therewith, the Debtors' business has been heavily dependent on physical consumer traffic tied to anchor tenants, and resulting sales conversion, to meet sales and profitability targets. The combination of the above factors, and others plaguing the retail industry as a whole, contributed to the Debtors falling short of their sale targets and depressed profitability performance.

42.    In addition to the challenges facing brick-and-mortar retailers generally, the Debtors have also suffered from recent operational challenges that have contributed to a steep decline in EBITDA. First, the Company expended substantial capital in 2016 to revamp the merchandise structure and enhance the personalization experience. These improvements temporarily drove positive comparable store sales. But the increased demand was hampered by a decrease in foot traffic due to numerous anchor tenants terminating leases through bankruptcy or otherwise. Second, in November 2016, the Debtors migrated their website to respond to the transition of consumer preference from brick-and-mortar stores to online channels, but experienced technical challenges associated with the migration, which impacted sales. Third, in

addition to challenges associated with the website migration, consistently declining sales squeezed liquidity and further forced cost cutting in key business areas, including with respect to marketing, inventory, store leases, and employees.

**B.**     **Supply Chain and Vendor Challenges.**

43.     As the Debtors' liquidity has tightened, vendors have begun to place pressure on the supply chain cost structure by delaying or cancelling shipments until receiving payment. Beginning in August 2018, merchandise shipments and inventory receipts began to slow due to shrinking liquidity and a lack of vendor support.  Prior to the Petition Date, substantial numbers of vendors refused to ship inventory unless the Debtors paid cash on delivery, resulting in shelf-ready merchandise being stranded.  Specifically, a large volume of inventory that was critical for the winter holiday season lay dormant in distribution centers and ports and was inaccessible due to a lack of liquidity necessary to satisfy vendors, which hurt the Company's performance during the all-important winter holiday season.  Consequently, the Debtors were materially behind their inventory receipt plan by approximately $5 million to start the holiday season.  The lack of fresh and sufficient inventory further tightened the Debtors' liquidity, creating a negative feedback loop.  Going forward, the Debtors' retail business will effectively starve without the flow of fresh inventory going into the historically high revenue spring season.

**C.**     **Store Closings.**

44.     The current store footprint is unsustainable in light of the Debtors' strained liquidity.  To this end, prior to the Petition Date, the Debtors concluded 37 closings of stores with January 31st lease expiration dates.  The Debtors will continue closings of approximately 250 stores postpetition.  The Debtors believe that closure of these stores is optimal under any reasonably likely scenario.  In anticipation of these closings, the Debtors engaged the Consultant to begin liquidating the inventory in the closing stores and otherwise preparing the stores for

turnover to the applicable landlords.  Through the store-closing motion filed contemporaneously with this declaration, the Debtors have requested authority to continue to the store-closing process through customary store-closing procedures.

## IV.    Restructuring Efforts.

### A.    Governance Matters.

45.    The Company's board of directors (the "<u>Board</u>") consists of five members, including two representatives of Kohlberg Kravis Roberts & Co. L.P., which is one of the Company's largest equity holders, and three independent directors.  The three independent directors are Matthew Kahn, Brent Kugman, and Michael Appel.

46.    In December 2018, the Board appointed the three independent members to a special committee (the "<u>Special Committee</u>").  The members of the Special Committee do not hold the Debtors' equity or debt or otherwise have a connection to the Debtors' lenders or equity holders.  The Special Committee was authorized to review transactions and/or negotiations that could result in a conflict of interest, including a potential restructuring transaction.  The Special Committee has overseen and directed the sale process and played an integral role in the restructuring process.

### B.    Employee Retention and Severance.

47.    The Debtors, at the direction of the Board, also implemented a program to ensure the retention of 12 key employees, consisting of three insiders and nine non-insider employees. Participating employees received a one-time payment equal to between 17 percent and 50 percent of base salary, totaling approximately $610,750 in the aggregate.  The participating employees executed "clawback" agreements under which they are required to refund the retention payment to the Company if terminated for any reason other than a qualifying termination before the earlier of April 30, 2019, or specified events constituting a substantial

completion of the restructuring process.  The participating employees are critical to the both the sale process and the store closing process, and the Debtors determined that these retention payments were critical to maximizing the value of the Debtors' assets.

48.     In anticipation of the store-closing sales and the broader restructuring process, the Debtors also implemented a non-insider employee severance program (the "Non-Insider Severance Program").  Consistent with historical practice, the Non-Insider Severance Program contemplates that, upon termination, employees will receive up to between four-weeks' and six-months' base pay, based on seniority and tenure of employment, less any payments required by applicable law, including the Worker Adjustment and Retraining Notification Act (the "WARN Act").  In order to preserve the value of the Debtors' estates, employees are ineligible for severance payments if they are offered comparable employment by the Stalking Horse Bidder or another buyer.  The Debtors paid a portion of severance prepetition to impacted employees at the Home Office.  The Debtors will seek Court approval in certain of the First Day Motions to pay the remaining amounts owed to the Debtors' Home Office employees and full amounts that may be owed to employees at the Fulfillment and Distribution Center under the Non-Insider Severance Program.

49.     Additionally, the Debtors will seek authorization to pay bonuses to store managers and assistant managers contingent upon such employees remaining employed with the Debtors through the applicable store closings (the "Store Bonus Program").  The Store Bonus Program applies to store managers and assistant managers at the Debtors' closing stores.  These employees will receive a one-time, fixed bonus if remaining at the applicable store through the store closing date.  In addition, the Debtors anticipate paying higher wages to the other hourly store-level employees to incentivize performance during the store closings.   The store

employees—along with their skills, knowledge, and hard work—are more critical now than ever. Through their commitment and performance, they can ensure that the Debtors continue to maximize stakeholder value in a challenging economic environment and at a time when those employees' positions will soon be terminated if no other bidder emerges that is willing to purchase the stores. The success of the sale and store-closing process, anticipated to proceed from the Petition Date to no later than March 30, 2019, depends on motivating employees to stay committed to the Debtors' business. Under the circumstances of these chapter 11 cases, the Debtors believe the Non-Insider Severance Program and Store Bonus Program ensure key personnel sustain and maximize the value of the Debtors' business operations. For these reasons, the Non-Insider Severance Program and Store Bonus Program also have the support of the Debtors' prepetition lenders and equity holders.

### C.    The Stalking Horse Bid.

#### 1.    Lender Negotiations.

50.    In the face of a looming year-end payment under the Revolving Credit Facility and dwindling liquidity, the Debtors initiated discussions with their prepetition lenders and Cortland, Cortland's counsel Weil, Gotshal & Manges LLP, and equity owners regarding debt restructuring options to maximize stakeholder value. The Debtors, in consultation with the secured lenders, determined not to repay the Revolving Credit Facility at year-end as required by the Credit Agreement in order to increase incremental cash-on-hand and extend the timeline for exploring restructuring alternatives. The lenders forbore default remedies between year-end and the Petition Date to provide runway to further explore the contemplated restructuring alternatives.

51.    In addition to the forbearance, the Debtors negotiated with the secured lenders, Cortland, and counsel to Cortland regarding funding of the prepetition marketing process and

these cases. Following substantial, arm's-length, good faith negotiations, these parties reached an agreement that permits the Debtors' consensual use of cash collateral in exchange for certain forms of adequate protection, including, among other things, adequate protection liens, superpriority claims, payment of certain fees and expenses, and postpetition payment of non-default interest.

52.     The Debtors' access to cash collateral is critical for the success of the going-concern sale and store closings. The Debtors have no unencumbered cash and the lenders under the Credit Agreement have a security interest in substantially all of the Debtors' assets, including their inventory and the proceeds thereof. The Debtors' retail business only generates cash by selling inventory, the proceeds of which constitutes the collateral of the lenders. Accordingly, the Debtors will be unable to maintain their operations throughout the sale process without immediate access to and use of cash collateral.

53.     Absent access to cash collateral, the Debtors will not have adequate unencumbered cash on hand to fund payroll, working capital, capital expenditures, and other general corporate expenses, forcing them to liquidate, which likely would result in less value available for distribution to all stakeholders than pursuant to the orderly sale process and store closures contemplated in these cases. Ultimately, the lenders consented to the use of cash collateral, subject to the terms of the cash collateral order, creating $11 million in incremental cash-on-hand to fund the prepetition marketing process and these chapter 11 cases.

### 2.     Prepetition Marketing Process.

54.     Recognizing the need to explore strategic alternatives, the Debtors worked with Kirkland & Ellis LLP and Stifel/Miller Buckfire to test the market. Stifel/Miller Buckfire compiled a targeted list of strategic and financial buyers and initiated a comprehensive marketing process. With downward spiraling liquidity and increasing financial challenges, the Debtors

concluded, in consultation with their legal and financial advisors, that pursuing a going-concern sale of the Direct Business and the Acquired Stores, coupled with a wind-down of all stores not acquired under the Stalking Horse APA, was the best option to maximize value for the Debtors' estates and creditors.

55.     The Debtors and Stifel/Miller Buckfire engaged in an extensive marketing process to solicit bids for the Debtors' assets and for the Debtors' business as a going-concern.  Leading up to the Petition Date, Stifel/Miller Buckfire contacted 28 potentially interested strategic and financial parties, comprised of 12 financial parties and 16 strategic parties.  Of these, approximately 13 parties entered into confidentiality agreements with the Debtors and received a copy of the Debtors' investor presentation and thus began the diligence process.  Six parties showed interest following receipt of the investor presentation and were granted dataroom access.  Four parties conducted management meetings or calls and three parties toured the Debtors' Fulfillment and Distribution Center.

56.     By early January 2019, the marketing process yielded two written proposals to acquire the Debtors' Direct Business but no physical store locations.  The Debtors and their advisors negotiated with both parties regarding material transaction terms, including purchase price, escrow payments for certain prepetition operational expenses, and chapter 11 timing milestones.  These negotiations progressed toward definitive asset purchase documentation; however, just days before the Petition Date, these parties and the Debtors were unable to reach an agreement sufficient to establish either party as a stalking horse bidder.  Ultimately, the Debtors countered with necessary adjustments, but neither party accepted those adjustments going into these chapter 11 cases.

### 3.     The Stalking Horse APA and Postpetition Marketing Process.

57.     In the week preceding the Petition Date, Enesco submitted a written proposal seeking to acquire a broader asset base than the other proposals—the Direct Business and the Acquired Stores.   The Debtors quickly moved to negotiate with Enesco in anticipation of obtaining a higher purchase price and preserving hundreds of jobs and potentially many more. After vigorous negotiations, the Debtors and Enesco reached an agreement on material terms and moved toward definitive documentation.

58.     The Debtors determined that Enesco's proposed $17.5 million purchase price for the Direct Business and Acquired Stores, subject to a right to add or remove stores with a 50 store minimum, was superior to the other potential stalking horse bids.   Enesco's proposal provided multiple benefits over the other written proposals, including, among other benefits, Enesco's familiarity with the gifting sector, the broader acquired-asset base, and greater prospective employment levels.   The Debtors also considered cost exposure in the event a higher and better bidder emerged from the postpetition marketing process.   The stalking horse bid, like the other going-concern proposals the Debtors received, requires the Debtors to continue operating the acquired assets as a going-concern, which presents an opportunity cost for every day that the Debtors do not otherwise dispose of the acquired assets through store-closing sales or otherwise.

59.     To mitigate these risks, the Debtors, lenders, and Stalking Horse Bidder agreed to an above-market $3 million deposit payable to the Debtors if the sale fails to close due to a material breach by the Stalking Horse Bidder and to an expedited sale timeline tailored to the circumstances of these chapter 11 cases.   Specifically, the Stalking Horse Bid and the proposed cash collateral order require an approximately 30-day sale process, with an auction by March 5, 2019, a sale hearing by March 6, 2019, and closing by March 8, 2019.   This timeline materially

reduces the risks associated with pursuing a going-concern sale, allowing the estates to realize its significant benefits and superior value.  Moving expeditiously to the sale hearing date allows the Debtors sufficient time to pivot to store-closing sales and disposition of the acquired assets should the deal fail to close.  Although the Debtors believe this is unlikely, the timeline is nonetheless critical to prevent downside risk.

60.     The Debtors and Stifel/Miller Buckfire will continue marketing and soliciting postpetition in accordance with the proposed bidding procedures.  Specifically, Stifel/Miller Buckfire will contact previously solicited parties, continue to provide acceptable bidders with data room access and requested information, consider a variety of alternative transaction structures, and otherwise assist the Debtors with all efforts to increase transaction value.  Continued marketing will invite any higher and better bids or otherwise ensure the Stalking Horse Bid represents the fair value of the Direct Business and Acquired Stores.

61.     In connection with the Stalking Horse APA, the Debtors have proposed bidding procedures pursuant to which they will conduct a process to solicit potentially higher and better bids.  The proposed bidding procedures include, among other things, approval of the terms of the Stalking Horse APA and bid protections consisting of (a) a break-up fee of 3.0 percent of the purchase price, (b) a $250,000 expense reimbursement payable to the Stalking Horse in the event the Debtors consummate another transaction, and (c) a minimum required bid increment of $50,000.  The terms of the Stalking Horse APA were negotiated on an arm's-length, good faith basis between the Debtors, Stalking Horse Bidder, and each party's advisors.  The terms of the Stalking Horse APA, including the bid protections, were a necessary inducement for the Stalking Horse Bidder to enter into the Stalking Horse APA.

D.     **Store Closing Sales.**

62.     Under the Stalking Horse Bid, all stores other than the Acquired Stores will be wound-down through the Phase 1 and Phase 2 Store Closings.  As discussed above, the Debtors entered into the Consultant Agreement with the Consultant to conduct these store closing sales. The Debtors evaluated other national liquidation firms before selecting the Consultant and believe that that the terms set forth in the Consultant Agreement, including a percentage fee based on the proceeds from asset dispositions, are the best alternative for the conduct of asset sales and store closures.  The Debtors believe that utilizing the skills and resources of the Consultant to effectively and efficiently conduct the sales and store closings will maximize value for all stakeholders.  The Debtors seek approval of the Consultant Agreement in connection with corresponding store-closing motion.

**V.     Relief Sought in First Day Motions.**

63.     Contemporaneously, the Debtors have filed a number of first day pleadings seeking relief that the Debtors believe is necessary to enable them to efficiently administer their estates with minimal disruption and loss of value during these chapter 11 cases.  The Debtors request that the relief requested in each of the first day motions be granted as critical elements in ensuring the maximization of value of the Debtors' estates.  These First Day Motions include:

- *Debtors' Motion Seeking Entry of an Order (I) Directing Joint Administration of Their Related Chapter 11 Cases and (II) Granting Related Relief;*

- *Debtors' Application for Appointment of Prime Clerk LLC as Claims and Noticing Agent;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Continue to Operate Their Cash Management System, (B) Honor Certain Prepetition Obligations Related Thereto, and (C) Maintain Existing Business Forms, and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and*

*Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing Postpetition Use of Cash Collateral, (II) Granting Adequate Protection to the Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of an Order (I) Authorizing the Debtors to File (A) a Consolidated List of Creditors in Lieu of Submitting a Separate Mailing Matrix for Each Debtor and (B) a Consolidated List of the Debtors' Thirty Largest Unsecured Creditors, and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Prepetition Taxes and Fees and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Determining Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Providers from Altering, Refusing, or Discontinuing Utility Services, (III) Establishing Procedures for Determining Adequate Assurance of Payment, (IV) Requiring Utility Providers to Return Deposits for Utility Services No Longer in Use, and (V) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing, But Not Directing, the Debtors to (A) Pay Prepetition Employee Wages, Salaries, Other Compensation, and Reimbursable Employee Expenses and (B) Continue Employee Benefits Programs and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Pay Prepetition Claims of Certain Lien Claimants and Import/Export Claimants, and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Pay Their Obligations Under Insurance Policies Entered Into Prepetition, (B) Continue to Pay Brokerage Fees, (C) Renew, Supplement, Modify, or Purchase Insurance Coverage, (D) Maintain the Customs Surety Bonds, and (E) Honor the Terms of the Financing Agreements and Pay Premiums Thereunder, and (II) Granting Related Relief;*

- *Debtors' Motion Seeking Entry of Interim and Final Orders (I) Approving Notification and Hearing Procedures for Certain Transfers of and Declarations of Worthlessness With Respect to Common Stock and (II) Granting Related Relief;*

- *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume the Consultant Agreement, (II) Approving Procedures for Store Closing Sales, (III) Approving the Implementation of a Customary Store*

*Bonus Program and Payments to Non-Insiders Thereunder, and (IV) Granting Related Relief;*

- *Debtors' Motion for Entry of an Order Shortening the Notice and Objection Period for the Debtors' Bidding Procedures Hearing;* and

- *Debtors' Motion Seeking Entry of an Order (I) Authorizing and Approving Procedures to Reject Executory Contracts and Unexpired Leases, (II) Authorizing the Removal or Abandonment of Personal Property Remaining at a Rejected Location, and (III) Granting Related Relief.*

64. These First Day Motions seek authority to, among other things, obtain the use of cash collateral on an interim basis, honor employee-related wages and benefit obligations, and ensure the continuation of the Debtors' cash management systems and other business operations without interruption. I believe that the relief requested in the First Day Motions is necessary to give the Debtors an opportunity to work towards successful chapter 11 cases that will benefit all of the Debtors' stakeholders.

65. Several of these motions request authority to pay certain prepetition claims. I understand that Rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 20 days following the filing of a chapter 11 petition, "except to the extent that relief is necessary to avoid immediate and irreparable harm." In light of this requirement, the Debtors have narrowly tailored their requests for immediate authority to pay certain prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates. Other relief will be deferred for consideration at a later hearing.

66. I am familiar with the contents and substance of each First Day Motion (including the exhibits thereto), and the statements and facts set forth in each of the First Day Motions are true and correct to the best of my knowledge. I believe that the relief sought in each First Day Motion: (a) is necessary to enable the Debtors to operate in chapter 11 with minimal disruption

or loss of value; (b) is necessary to provide the Debtors with a reasonable opportunity for a successful reorganization; and (c) best serves the interests of the Debtors' stakeholders.

[*Remainder of page intentionally left blank*.]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true correct.

Dated: February 6, 2019                    */s/ Robert J. Duffy*
Wilmington, Delaware                   Name: Robert J. Duffy
                                                         Title: Chief Restructuring Officer